Case No. 18-2095 May it please the Court, John Ballard for the United States. I'd like to reserve two Can you speak a little closer to the mic? Yes, sir. Thank you. The District Court granted Nash's motion to suppress based on a factual error and a legal error, each of which independently require reversal on this case. First, the District Court rejected a portion of an officer's testimony about what happened during Nash's weapons pat-down based on an audio recording that was entirely consistent with the officer's testimony. Doing so was clear error under this Court's holding in Gonzales. A District Court can't reject a witness's testimony without any evidence in the record to contradict it. Second, the District Court applied the exclusionary rule to suppress evidence that officers found during searches following Nash's arrest for a new and intervening crime. Even assuming that a Fourth Amendment violation happened in this case, the drugs and the loaded firearm that officers found weren't fruits of the supposed Fourth Amendment violation. Rather, under a long line of cases from this Court and many others, that evidence was instead the fruit of Nash's intervening voluntary distinct crime. Now, before I begin with the factual error that the District Court committed in this case, I want to begin by talking about the facts that led up to that supposed error in Nash's encounter with Hobbs Police Department Officer Hough. Now, the District Court correctly concluded that Officer Hough lawfully stopped Nash's car for littering and for failing to maintain a legible license plate. The District Court also correctly concluded that Officer Hough prolonged that stop to investigate Nash's suspected driving under the influence. And the District Court correctly concluded that Officer Hough reasonably suspected that Nash was armed and dangerous, thus justifying a weapons pat-down. The only issue in this case happened in a span of about 15 seconds in deciding whether Officer Hough exceeded the scope of the weapons pat-down that the District Court had already concluded was lawful. I thought it was four seconds. So the entire pat-down from the time that Officer Hough began preparing Nash by putting his hands behind his back, by securing his hands, and then by beginning to swipe the baggie, there was about a four-second span in between when Officer Hough indicated on the audio recording that there was a lot going on in Nash's right pocket and then from the time when he felt the baggie. So that was about a four-second gap in between there, but the entire time... When he said, is that a baggie? Correct. He said, is that a baggie, indicating that he felt the baggie. There's four seconds between, I noticed this right pocket, you got a lot of stuff going on, and then there's four seconds, and then, is that a baggie? Correct. But the entire pat-down, including the time that it took to prep for the pat-down, was about 15 seconds. Now, he never did go into the individual's pocket, did he? No, he did not, and that is why, as we discussed in our opening brief, there was a Fourth Amendment framework issue with how... That's why, I'm sorry? That's why, in our opening brief, we indicated there was a Fourth Amendment framework issue with how the District Court set up the issue, because I think the District Court seemed to believe that the Fourth Amendment violation in this case was Officer Hoff attempting to reach into Nash's pocket without probable cause to believe that the pocket contained contraband, but, of course, there's no actual search when an officer just attempts to do something like reach into a pocket. So, the District Court clearly erred in determining that there was even a Fourth Amendment violation in the first place. The only time when a violation could have occurred is in, again, that short period of time, and under Gonzalez, the error here was clear, really, for two reasons. First, Officer Hoff's testimony on the point was clear. The District Court misinterpreted the record and misinterpreted Officer Hoff's testimony when the District Court stated that Officer Hoff never clearly stated whether he felt the suspected value of narcotics during the course of his lawful weapons pat-down. In fact, through a course of about three or four questions, Officer Hoff made clear that it was during the course of his lawful weapons pat-down. It was during what? During the course of his lawful weapons pat-down. You're talking very rapidly. I apologize. I can't hear that fast. Officer Hoff, throughout the course of three or four questions that the AOSA asked him, did make it clear that it was during the course of his lawful weapons pat-down that he discovered the value of narcotics. In the District Court's order, when it granted Nash's motion to suppress, the District Court only cited Officer Hoff's answers to the first and the last questions in that exchange between the witness and the AOSA. But really, the important context in determining what Officer Hoff testified to comes in the questions that led up to his last answer and in the question that was asked of him the last time. Now, the issue, again, was whether Officer Hoff felt this baggy during the course of the lawful weapons pat-down. And the last question that the AOSA asked the officer before he began talking about what he felt was, what happened then during the pat-down search, about which he had just asked the witness three or four questions to determine what the purpose of that search was. And so the fact that Officer Hoff didn't repeat, well, it was during the pat-down search that I felt baggy, doesn't matter because the question that was posed to him confined the scope to what happened during the course of that weapons pat-down. He was only asked about what happened during the course of the weapons pat-down. And so it's clear that his answer referred to that. So your argument is, she said it's technically true that what the district court found, which is that he never technically testified that he found the baggy before he determined that Nash had no weapon. But substantively, he said that by saying, I found it during the pat-down. Well, actually… Is that the argument or am I misstating? Not quite, because the questions leading up to that point, they asked about what the purpose of the pat-down search was. And he was asked, what were you looking for? I was looking for dangerous weapons. Were you looking for anything else? No, I wasn't. And then he was asked, what happened during the pat-down search? And then he gave his answer. And so I don't even think that there's any ambiguity there. I mean, when a person asks you a question that confines the scope to what happened during a particular time, and then you give an answer, just because you don't specify that your answer is limited to that particular time, it doesn't matter because the question limited to that particular time, because they only asked about what happened during the weapons pat-down. Could you focus back on the first… My understanding is that you're suggesting the district court relied on basically two findings. I don't disagree with that, that the audio recording conflicted with Officer Hoff's testimony. And then second, this issue about whether he testified that he found a baggie during the pat-down. The first issue you suggest, at least in your opening remark, that it absolutely did not conflict. The audio recording did not conflict. I don't know that we can say that absolutely. I think it's possible that it conflicted. She heard the audio. Correct. And so I'm wondering how we can say it's clearly erroneous that the audio recording conflicts. Your version, and I understand your version, is that it certainly doesn't have to conflict because in that four-second period, he could have moved from the right pocket to the left pocket, and he testified he did. But perhaps she didn't believe his testimony. Or do you see what I'm saying? I do. How can we say that's clearly erroneous? I think we would be in a much worse position on appeal on this issue if it weren't for this court's decision in Gonzales, a case involving the exact same district judge that was the judge below in this case. And that case involved a factual finding that this court determined to be clearly erroneous under exactly the same circumstances, meaning the circumstances where an officer clearly testified that a fact was true. The district court had independent evidence that didn't really speak one way or another on the issue. The district court then said, well, I just don't believe the officer's testimony because I don't think he exhibited credible demeanor.  This court looked at that other piece of evidence and determined, no, it doesn't actually contradict it. And in fact, in that case, it did leave open the possibility, just as you're saying. In Gonzales, the other piece of evidence was a witness's testimony. And the issue was whether that witness had learned about a particular clause in the arrest warrant before agreeing to cooperate. And in that case, the witness testified, I don't remember when I learned about that. When the officer testified, no, she only learned about it after she agreed to cooperate. And so in that case, just as the recording leaves open the possibility of a contradiction, this court nonetheless said that's clear error because there's no actual contradiction in that piece of evidence. Well, can I just stop you there? So how do you read Gonzales on that specific point? Basically, you're saying that as long as the allegedly contradictory evidence can be read as not contradictory, you go with the testimony. Is that how you're reading it? I'm reading it as if there's no possibility that it's contradictory, then there's, or rather, not that there's no possibility that it's contradictory, but that you can't look at the evidence and make the finding on the basis of that evidence alone. And so I guess what I'm saying is if all the district court had was the audio recording, there's no way that it could find a violation based on just that audio recording because it doesn't clearly indicate one way or another. Well, does it make any difference in this case? He was there for a sobriety check, wasn't he? Yes. And the sobriety check had not occurred. Correct. And he fled. Correct. And there's no evidence that the officer put his hand in his pocket at all, is there? No. And once he fled, was he violating any law? He was. And thank you for segwaying me into my second issue. And when he was caught, was there any question that that arrest was illegal? No question at all. All right. So do we even need to address the first issue? The court doesn't need to. Each of the issues that we raised in our brief provide an independent basis for reversing the district court's erroneous order. And so moving on to, again, even accepting the district court's erroneous version of facts where a Fourth Amendment violation occurred, nonetheless, the exclusionary rule didn't apply to that evidence because the evidence that officers discovered and seized, they seized it and discovered it during searches following his lawful arrest for a new and independent crime that he committed after the violation. Now, going back to first principles and the Supreme Court's decision in Wong San dealing with Fruit of the Poisonous Tree, near but-for causation between a Fourth Amendment violation and then the discovery and seizure of evidence is not enough to trigger the exclusionary rule. Rather, the question is, to quote Wong San, whether officers have come at the evidence by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the crime retained. And in this case, officers came about this evidence not because of the Fourth Amendment violation, even though there is but-for causation between the violation and the discovery of the evidence. They didn't come about it because of the Fourth Amendment violation. Rather, as a matter of policy, they came about it because of Nash's new and independent crime that he committed, which led to his arrest, which led to the search incident to arrest, which led to the inventory search. Now, this is probably the smallest Fourth Amendment violation you could even conceive of. If a violation occurred in this case, it was Officer Hoff patting Nash's pocket for a couple of extra seconds. And in response, Nash criminally fled in the middle of what was, as the district court correctly concluded, a lawful sobriety check. Officers had not yet completed the field sobriety tests, and so Nash committed a crime by fleeing in the middle of that, even though it was in response to an alleged Fourth Amendment violation. Now, Nash, again, doesn't dispute that the arrests were lawful. And because of that, because of that lawful arrest, there are Fourth Amendment consequences. As of automatically, a search incident to arrest is reasonable at that point, and automatically it's reasonable to inventory the contents of his car if a regular policy from the police department allows for impounding and inventorying the contents of the car. And so as a matter of policy, again, there was an intervening circumstance, Nash's voluntary criminal act, that led to the discovery and seizure of that evidence. And so as a matter of policy, this court and numerous others from all of the other courts that have cited have indicated that, as a matter of policy, even though there is a but-for causal relationship between the violation and the discovery of the evidence, nonetheless, officers haven't come about that evidence by exploiting the Fourth Amendment, that they've come about it because of the defendant's voluntary criminal conduct. If the panel has no further questions, I'd like to reserve the remainder of my time. Thank you. Good morning. I'm Dean Sandiford on behalf of Quincy Nash, the appellate. I'd like to start where my opposing counsel left off with the attenuation doctrine, because they are both independent grounds for reversing the district court's order. The government's argument here really rests on this idea that there's a new crime exception to attenuation doctrine. Did your client have the right to run off because he felt that there was an unconstitutional effort to search his pocket? Absolutely not, Judge Kelly. And we agree. And so then, did he violate a law when he ran off? He absolutely did. He violated a New Mexico statute. And was he subject to arrest at that point? He was. But the question, from our point of view, is whether or not that arrest and the search subsequent to that was attenuated from the original illegality. It was a new crime, wasn't it? It was a new crime. But that doesn't automatically establish an intervening circumstance for purposes of attenuation doctrine. Well, while Hodari was a seizure, it was clearly unconstitutional. And yet, when the individual threatened the officers with a gun, it was a new crime. Hodari D., I think, was they ordered him to stop and he didn't. So there never was a seizure. I'm sorry? Hodari D., I thought you were talking about Hodari D. That case, there was never a seizure at all because he ran when the cops ordered him to stop. My guy was definitely seized. There's no question he was seized. When he was patted down, he was searched. Well, you can do a Terry stop, can't you? Sure. You're not quarreling with the Terry stop? Oh, no, not at all. But I'm quarreling with the notion that he wasn't seized. He was definitely seized at that time. And according to the district court's order, the district court order didn't say, I don't read the district court's order to say he violated, Hough violated the Fourth Amendment by attempting to reach into his pocket, but that he exceeded, that he'd already determined there was no weapons and was continuing to search the pocket. Well, aside from that, so what? I mean, if the search, let's assume that the Terry pat down was wrong. Sure. His fleeing in the face of a sobriety test that he had not yet taken. Why isn't that a sufficient attenuation to search him incident to the arrest? Because there's not a new crime exception in this circuit. I'm sorry, there's what? There's not a new crime exception to the attenuation doctrine in this circuit. You still have to go through all three of the factors. Temporal proximity, they don't dispute. Whether there's an intervening circumstance, we agree that some new crimes could be an intervening circumstance. There's no question about that. But this was a predictable, reasonably foreseeable response. Why? Because he was doing an illegal search on the guy's pocket and the guy knew it. Well, he wasn't. There's no evidence that he went into that pocket. He didn't have to go into the pocket, Judge Kelly. If he was feeling around after he determined there was no weapons. It could have been a hand grenade. I mean, what is wrong with doing a pat down? There's nothing wrong with doing a pat down. What's wrong is once you do a pat down and determine there's no weapons, you can't keep going. And that's what the district court found that he did. That's what the district court found that he did. Was that based on a fourth second, a guesstimated fourth second too long, in her opinion, to move from one side to the other? Yeah, it was based on the ambiguity of the tape. I mean, if he says that there's a lot going on in this right pocket, four seconds go by, he doesn't mention anything about the left pocket. Is that a baggy? If he's still on the right pocket, he's probably violated Terry at that point, because if he's feeling around for that many seconds. Were you suggesting it was the right pocket that was the illegal seizure? There were drugs in both pockets. Or the illegal search? Yeah, there were drugs in both pockets. Yeah. And if that was an illegal search, it was an illegal search. And at that point, you apply attenuation doctrine to see whether or not suppression should occur. So we agree. I don't want you to leave that yet, because you just said it was her finding was based on the ambiguity in the record. I did not. She didn't detail that. That's my problem with her finding, is she said, the way I read it, the audio recording conflicts with Officer Hoff's testimony, when, in fact, as the government points out, you could certainly read it not to conflict at all, and Officer Hoff testified consistently with that reading. So my problem is her finding that it conflicts, because it seems to be sort of a hard and Yes, I guess I would agree with that in part. You know, there's two orders here, and one's the order on reconsideration, one's the original order. The original order, she's softer in her ruling, I think, and says that it's just unclear, because the tape is unclear. By the time it gets to reconsideration, she does say, as you said, that it conflicted. Well, and she even quotes from the transcript, where, of course, if you're looking at the transcript by that point, it does appear to conflict, because you can't tell there's a four-second. Right. There's not a clear four-second delay in there. It comes right immediately after in the transcript. So I wonder, you know, how do we take that? Yeah, I guess I would say I'd give more weight to the first order, because, you know, what the government was asking her to reconsider was a factual decision that she'd made. It was months later. She might not have gone back to listen to the tape, but she wasn't going to reconsider the decision, because she'd made it before. So I, you know, I don't know. What about if we, suppose we agree with you on that, and we say, yes, looking at her first holding, it, you know, she recognized the ambiguity, not clearly erroneous. We still have a problem with, she based it on two findings, and she didn't seem to weigh one more importantly than the other. And the second finding is seemingly problematic, because he definitely did testify in response to questions about what he did during the pat-down, that he felt the baggie in the left pocket during the pat-down. So I don't see how we can accept her finding that he, that he found the baggie after. Well, you have to look very carefully at what she actually said he didn't testify to, and what she said was... I am looking carefully at that. Okay, well, this is... I think explicitly he didn't use those words, but he responded to questions about what happened during the pat-down. Yes, that's true, but what he, what she says is he never testified that he hadn't yet determined there was a gun by the time he felt the baggie. He never did testify to that. He does say... Well, the purpose of a pat-down, as he recognized, is to search for weapons. He said so. Right. And when he said, yes, this was during the pat-down, that means he's still looking for weapons. Right. Well, well, I think that's... Does he have to say that explicitly? Well, I think that what she's saying is that he... No, I don't think he did have to say it explicitly, and I don't think the district court is saying he had to say that explicitly. I think that finding has to be viewed in light of the other finding about the ambiguity on the tape. I think what she's saying is, like, if he had really said this explicitly to me, then maybe the ambiguity wouldn't be such a big deal, but he didn't, and he really didn't. I mean, I understand that probably even the most reasonable inference from his testimony is that he was still patting down for weapons. That's not what she said, though. I mean, we don't have those kinds of findings. Well, no, but she did say, moreover... She seemed to base it on the two. And I guess I'm asking, if we happen to agree with you on the first, but not on the second, don't we still have a problem? Because at least half of her rationale is erroneous. Well, I think if you were going to say that half the rationale were erroneous, I think the proper thing... Or findings, I guess. Or findings would be to send it back and let her clarify it. Because I do think that, you know, I don't think that I'm necessarily wrong in the way I'm reading her order. It's a pretty short order. I mean, it's 17 pages total, but this part of it's pretty short. I do think that she's saying, in context, this lack of testimony matters to me because of the ambiguity I've already identified. I understand that she didn't say that explicitly, but it's possible. And I think that if half of her order is correct, then I think she ought to be given the chance to fix that. If I could just go back to the attenuation doctrine for just a moment, the new crime exception piece of it. Judge Kelly, I just want to get back to your point about we do agree that there was a new crime committed. We just don't agree that a new crime is necessarily going to break the causal chain underground versus... Well, is it your position that unless all three of those are clearly established, you cannot conclude that the search was okay? No, that's not our position. But it is our position that one of them can't trump all the others, and that's what the new crime exception would do. Well, let me ask you this. How long or how much temporalness must occur before you would say that it meets the temporal proximity between the police illegality and the search? The Supreme Court said in Utah versus Streef that even two hours favors the defendant. Well, clearly. Now, how about one hour? Sure. How about 20 minutes? We're all on the defendant's side. If it's a second distinct crime that occurs during an attempt to flee, why doesn't that suffice? And assuming it doesn't suffice, is there anything that says that temporalness overrides the other two factors? No, and I'm not suggesting that temporalness overrules the second two factors. I actually think the second factor is, at best, a wash. It might even favor us, because this isn't like Waka Penne, where he pulls a gun on the officer, or the case that we describe about bribery. Trying to tear away from the police when they're doing an illegal search isn't that unforeseeable, I don't think. That would be less temporalness than in this situation, trying to tear away from the police and actually running, even though it's only a short distance. It was like, what, eight feet? Yeah, I think it wasn't far. And I don't even think Officer Huff, the way I understood his testimony, he hadn't even— Is it to punish the police for making an error of judgment? No, the purpose of the Disclusionary Rule is to deter police conduct. But the way you go about deciding that in an individual case under attenuation doctrine is to apply the three factors. And if you apply those three factors here, I don't think he did much more than tear away from the police. It sounded like Officer Huff barely lost hold of him at all before he was tackled. Well, there's no question that there was intervening circumstances. No, no. You've got to give him that. Oh, sure. Of course, I give him that. OK. And there's no question that it was not a flagrant, deliberate violation of someone's constitutional rights. Well, no, I'm not so sure about that. I mean, the district court— Do you think they deliberately violated his rights when they arrested him for fleeing and then searched him? No, no, I don't think that. I think they deliberately— I'm sorry? No, I don't. But I think they might have deliberately violated his rights when they exceeded the to begin with. If he was done searching for weapons and was continuing to feel around in his pockets, every cop— Well, we're past that point, OK? You've got an illegal search, a bad Terry stop, but a valid sobriety investigation. And now he flees. Right. OK. And you conceded that that's in itself a crime. Yes. And so the only thing that we're lacking on the three brown factors, in your opinion, is the temporal proximity between the police illegality and the search. That's not my position, Judge Kelly. I'm sorry. I must have misunderstood your argument. And I don't—and I'm not—and the attenuation is from the police illegality. We're talking about whether or not the initial—for the purpose of this argument, you've got to spot me the illegal frisk because we don't get to attenuation otherwise. It's whether that's attenuated. I don't question their arrest of him. But if there's not a sufficient attenuation between the illegal frisk, the squeezing the pocket, whatever he did after he decided there was no weapons, then the question is whether that's purposeful or flagrant, not whether it was permissible for them to arrest him for resisting arrest. So they could arrest him for resisting arrest. Sure. They could arrest him. OK. And if they got him to the police station— Yeah. —to put him behind bars until the magistrate could give him bond— Right. —and he was made to empty his pockets, would that be an illegal search? No, it wouldn't. But again, the question— Why not? Because they'd arrested him. They can search him for that. Well, they arrested him in this situation, too. Yeah, I know it. And so that search by itself, if you take that out, that's not an illegal search. The question is whether it's sufficiently attenuated from the illegal search that happened before. We don't—we do not—we do not contest that he was validly arrested for resisting arrest and that under normal circumstances, or even just under these circumstances, they could search him incident to that arrest. The question is whether or not they could use the fruits of that search, given its connection to the original illegality. But what is the purpose of the suppression under these circumstances? To deter them from doing illegal frisks, to deter the police from doing illegal frisks. So it's to deter the Terry stop that earlier occurred— Seconds before— —which you've said was OK already. No, I did not say that was— You said the Terry stop was legal. The Terry stop, but the frisk exceeded the scope of the frisk. The frisk exceeded the scope. Yes, I'm sorry. I said stop. I meant frisk. I apologize. And you—so that's so flagrant and deliberate that we're going to suppress all the evidence that occurred after another crime? Well, that's one of the three factors. And flagrancy— I just want to understand your position. Sure, sure. No, I understand. And flagrancy, you know, we don't make a big argument on that. But I do think if he did—if Hoff did exceed the scope of a Terry frisk, I think the district within its rights to say that it was purposeful. Cops know they can't feel around in people's pockets after they've determined there are no guns. And if that occurred, then I don't see why that factor wouldn't favor us, especially since the Supreme Court said you only need either one, purposeful or free. I see I'm almost out of time. Thank you. I want to begin by addressing two points on the factual issue and one point on the legal exclusionary rules issue. First, on the factual issue, my opposing counsel said that Officer Hoff said nothing on the recording about the left pocket. But that begs the question. Because, of course, our position is that when he said something about, hey, is that a baggie on the recording, that actually did refer to the left pocket. Now, that's not entirely clear from the recording itself, but it is clear from Officer Hoff's testimony. And the issue is whether the district court could reject that testimony on the basis of one way or another. Second, to address Judge Moritz's point about the sort of two subsidiary determinations that the district court made on the factual issue, really, I think there's one factual finding here. And that finding would be whether Officer Hoff exceeded the scope of a tariff risk or whether he continued to feel around in the right pocket. And those two sub-issues are really just subsidiaries of that one factual finding. And so I don't think that remand is appropriate here. Because I think what the district court did was reject clear testimony on the basis of an audio recording that didn't conflict with that. And so there's really just one error there in making the finding that Officer Hoff continued to frisk the pocket on the basis of an audio recording that didn't conflict with the officer's clear testimony. Moving on to the point about the exclusionary rule, my opposing counsel said that the flight was a predictable consequence of the violation and that deterrence would be served here. However, in a case where there is a particularly egregious Fourth Amendment violation or where there's a deliberate design to create the crime, that might be a case where deterrence is served by suppression. And that might be a case where the new crime exception, I see that my time has expired. I'm going to finish my talk. Please finish. That might be a circumstance where the new crime exception doesn't apply. But courts have recognized that. In Bailey, for example, cited in our brief in footnote 9, the court said, we are not confronted here with a suggestion that agents intentionally provoke the flight. If that had been the case, we trust courts to discern that and to not tolerate such abuses. And in Murcia, also cited. I'm going to finish. We ask that the court reverse the anticipatory suppression. Thank you both very much for your very helpful arguments. And we will submit the case. And counsel, excused.